COURT OF APPEALS OF VIRGINIA

Present: Judges O'Brien, Malveaux and Senior Judge Frank

SEPTEMBER R. LYNN

v.     Record No. 0955-19-3

CAMPBELL COUNTY DEPARTMENT
  OF SOCIAL SERVICES

SEPTEMBER R. LYNN

v.     Record No. 0956-19-3

CAMPBELL COUNTY DEPARTMENT          MEMORANDUM OPINION[*]
  OF SOCIAL SERVICES                        PER CURIAM
                                          JANUARY 7, 2020
SEPTEMBER R. LYNN

v.     Record No. 0957-19-3

CAMPBELL COUNTY DEPARTMENT
  OF SOCIAL SERVICES

SEPTEMBER R. LYNN

v.     Record No. 0958-19-3

CAMPBELL COUNTY DEPARTMENT
  OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF CAMPBELL COUNTY
John T. Cook, Judge

(Aubrey J. Rosser, Jr., on brief), for appellant.

(David W. Shreve; George W. Nolley, Guardian *ad litem* for the
minor children, on brief), for appellee.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

September R. Lynn (mother) appeals the circuit court orders that terminated her parental rights to five of her children. Mother argues that the circuit court erred in finding that the evidence was sufficient to terminate her parental rights under Code § 16.1-283(B) and (C)(2). Upon reviewing the record and briefs of the parties, we conclude that these appeals are without merit. Accordingly, we summarily affirm the decision of the circuit court. See Rule 5A:27.

BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." Yafi v. Stafford Dep't of Soc. Servs., 69 Va. App. 539, 550-51 (2018) (quoting Thach v. Arlington Cty. Dep't of Human Servs., 63 Va. App. 157, 168 (2014)).

In August 2012, mother lived with her husband, Charles Ryan Lynn ("Ryan"), and her five children in Campbell County.[2] From 2012 through 2017, the Campbell County Department of Social Services (the Department) received multiple complaints about the family, including allegations of sexual abuse, inadequate supervision, poor hygiene, and physical neglect. The Department provided ongoing services to the family, such as counseling for the parents and the children, parenting education, after-school programs for the children, and financial assistance.

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

[2] Ryan is the biological father to mother's youngest child, T.L., but not her other four children.

In June 2014, mother was not supervising all of the children, and T.L. jumped off the roof of the family's home.[3] After the incident, Ryan quit his job as a loss prevention officer to stay home and supervise T.L.

After participating in services for years, the family's situation had not changed or improved. Dr. Maxey, a counselor involved with the family from October 2014 until June 2015, found that mother was willing to listen, but she was "very dependent emotionally on making a connection with [Ryan]." Mother did not demonstrate an ability to follow through with necessary tasks.

In October 2015, Ryan was diagnosed with chronic fatigue syndrome, which caused him to have difficulty with daily activities, such as dressing, bathing, and fixing dinner. He was bedridden for approximately two years. As a result, mother was the main caregiver for the children.

On September 29, 2017, the Department received a complaint about deteriorating conditions in the home. A counselor had been visiting the home in August and September 2017, and found trash, dog feces, and clutter throughout the home. The counselor testified that rotten fruit was in baskets by the front door and kitchen, and when she entered the front door, "a cloud of fruit flies" hit her in the face. At first, the counselor tried working with, and encouraging, mother to clean the house.[4] However, by September 29, 2017, the condition of the home had not improved. The kitchen had rotten food on the table and counters. The children's bedrooms contained rotten food, dirty diapers, and dirty clothes, and the mattresses were urine-stained. The toilet in the children's bathroom did not work, and mother would not let them use her bathroom. The children went to the bathroom in the sink or on the floor. The Department

---

[3] Ryan testified that he was at work when T.L. jumped off the roof.

[4] Ryan stayed in his bedroom while the counselor visited.

removed the children on October 2, 2017.[5]  Mother and Ryan minimized the conditions of the home to the social workers.

After the children entered foster care, the Department required mother and Ryan to improve their support system, maintain contact with the Department, participate in outpatient counseling, participate in marriage counseling, clean the home and keep it in a safe condition, participate in parent engagement services, participate in supervised visitation, address physical health issues, and resolve transportation issues.  The Department wanted mother and Ryan to accept responsibility for their actions and apply what they had learned to their daily lives.

The Department provided additional support services for mother and Ryan.  The Department offered parent engagement services, supervised visitation and outreach counseling, financial assistance, individual counseling, and marriage counseling.  In mid-December 2017, mother and Ryan moved to a mobile home.  Clutter built up in the mobile home, despite counselors encouraging mother and Ryan to clean and organize.  The Department did not visit the mobile home because mother and Ryan had not otherwise progressed to the point where the children could visit or return to the home and mother and Ryan had stated that they would move if the children were returned.

Dr. A. James Anderson conducted psychological and parenting evaluations of mother and Ryan in 2013 and 2018.[6]  Mother reported having numerous medical problems throughout her

---

[5] T.L. was six years old at the time of the removal.  Mother's other children were eight years old, nine years old, twelve years old, and thirteen years old.

[6] Dr. Anderson found that Ryan's depression was "much stronger" in 2018 than in 2013. Dr. Anderson doubted that Ryan would have any "therapeutic gains" because Ryan had had "quite a few interventions, extended experience with treatment and [Dr. Anderson] did not see any more improvement, and in fact did see some lost ground as far as his emotional and behavioral functioning."  Furthermore, in 2018, Ryan scored in the "at-risk range on the risk assessment instrument for child physical abuse," whereas in 2013, he scored in the "low risk range."

life, as well as having an extensive substance abuse history. Dr. Anderson was concerned that he did not see more improvement with mother between 2013 and 2018, and in fact, some things had "gotten worse over that period of time." In 2018, Dr. Anderson found that mother was "excessively self-focused" and continued to "externalize blame and responsibility." Mother showed "significant anxiety, depression and instability of mood and emotions," which would affect her ability to nurture her children. In 2018, mother scored in the high risk range on the risk assessment instrument for child physical abuse, whereas in 2013, she scored in the low risk range. Dr. Anderson recommended treatment "for an indeterminate period of time . . . to keep things from deteriorating, getting out of hand."

Throughout the years of the Department's involvement with the family, mother and Ryan blamed others for their situation and rarely took responsibility for their actions. The Department noticed that mother had great difficulty focusing, whether on tasks or during counseling sessions. Mother did not appear to be capable of improving her situation.

From October 2017 through May 2018, the Department offered weekly supervised visitation between mother, Ryan, and the children.[7] Before the visitations, a licensed professional counselor offered parenting skills education to mother and Ryan. The counselor also worked with them on budgeting, organization, time management, transportation issues, and referrals to food banks and other social services. Mother and Ryan had never progressed to having increased visitation or home visits, and despite all of the services provided, they had not improved their situation. In fact, at times, they could not meet their own basic needs, such as having food in the home, attending appointments, and having reliable transportation, and they never demonstrated an ability to meet the needs of the children who have special needs.

---

[7] Mother came to all of the visits; Ryan missed one visit when he was sick.

The children, meanwhile, were distressed about the visitations and worried about what was going to happen to them. In June 2018, the Department stopped the visits because one of mother's children alleged sexual abuse by a relative and the parents had not shown any progress. Mother and Ryan avoided any accountability, but acknowledged that they knew about previous allegations of sexual abuse and did not know how to handle it. In September 2018, the Department petitioned to have mother's and Ryan's parental rights terminated.

Beginning in October 2018, mother and Ryan met with a licensed clinical social worker for ten, one-hour sessions because of the stress and depression due to the Department's removal of their children. The counselor found them to be "honest and open" and motivated toward reuniting with their children.

On January 8, 2019, the Campbell County Juvenile and Domestic Relations District Court (the JDR court) terminated mother's parental rights.[8] Mother appealed the JDR court orders to the circuit court.

On April 15 and 16, 2019, the parties appeared before the circuit court. The Department presented evidence that T.L. was a "very bright[,] precocious little boy." When he entered foster care, T.L. had issues with bed-wetting and nightmares. The Department referred him to counseling, and by the time of the circuit court hearing, he was "very well adjusted." T.L.'s foster parents expressed a desire to adopt him.

The Department referred mother's other four children to counseling. The oldest male child was anxious and had taken on the role and responsibilities of a parent. At the time of the circuit court hearing, however, he was "much, much, much better." The other male child had been the one who "was perceived to cause all of the problems and just be the most unstable, the

---

[8] The JDR court also terminated Ryan's parental rights, and he appealed to the circuit court.

- 6 -

most unruly, the hardest to manage." However, while in foster care, he had stabilized and demonstrated a desire to please others. The oldest female child had been diagnosed with attention deficit hyperactivity disorder, autism, and disruptive mood dysregulation disorder. She participated in counseling and received medication management and additional clinical and educational support services. Since being in foster care, she had developed independent living skills. The youngest female child was diagnosed with attention deficit hyperactivity disorder and post-traumatic stress disorder. She had problems with bed-wetting and nightmares when she entered foster care, and she displayed "a lot of baby like behaviors," despite being eight years old at the time. She received counseling, medication management, and mentoring services. At the time of the circuit court hearing, she had made "a lot of progress." Since being in therapy and foster care, all of the children had become "appreciative of the stability of their foster homes." All of the children were in pre-adoptive homes.

Mother testified that at the time of the removal, she was depressed and overwhelmed with caring for the children and Ryan. Mother wanted all five children to be returned to her care, but was not in a position to care for all of them at that time.[9]

After hearing all of the evidence and argument, the circuit court terminated mother's parental rights under Code § 16.1-283(B) and (C)(2).[10] These appeals followed.

---

[9] Ryan testified that his physical condition had improved and that he was "functioning at a much higher level" than he had been in October 2017, when the children were removed. He wanted T.L. to be returned to his care, but acknowledged that it was not "feasible" for all five children to return to his and mother's care.

[10] The circuit court also terminated Ryan's parental rights to T.L. under Code § 16.1-283(B) and (C)(2). Ryan appealed the circuit court order. See Lynn v. Campbell Cty. Dep't of Soc. Servs., Record No. 0954-19-3.

ANALYSIS

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cty. Dep't of Family Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128 (1991)).  "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it."  Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)).

Mother argues that the evidence was insufficient to support the termination of her parental rights under Code § 16.1-283(B) and (C)(2).  The children entered foster care on October 2, 2017, and mother's last visit with them was on May 23, 2018.  The Department filed its petitions to terminate her parental rights on September 17, 2018.  Mother contends that when the Department stopped her visitation with the children, it had decided prematurely to terminate her parental rights before the expiration of the twelve months as contemplated by Code § 16.1-283(C)(2).[11]  We disagree.

The Department had been working with, and providing services to, the family since 2012. When the children entered foster care in October 2017, the Department provided additional

_____

[11] A court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or
> unable within a reasonable period of time not to exceed 12 months
> from the date the child was placed in foster care to remedy
> substantially the conditions which led to or required continuation
> of the child's foster care placement, notwithstanding the
> reasonable and appropriate efforts of social, medical, mental health
> or other rehabilitative agencies to such end.

Code § 16.1-283(C)(2).

services to mother. Despite numerous services over an extended period, mother had not made any progress in her ability to manage her life or care for the children. In fact, Dr. Anderson was concerned that mother's situation had not improved since he last saw her in 2013. By the time the JDR court terminated mother's parental rights, the children had been in foster care for approximately fifteen months, and mother had not substantially remedied the conditions that led to the children's foster care placement. "Code § 16.1-283(C)(2)'s twelve-month time limit 'was designed to prevent an indeterminate state of foster care "drift" and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in the foster care placement.'" Thach, 63 Va. App. at 171 (quoting L.G. v. Amherst Cty. Dep't of Soc. Servs., 41 Va. App. 51, 56 (2003)).

In addition, mother argues that the Department had treated the children as a collective group, as opposed to individuals, and that the Department had not proven that returning one or more of the children would be "inappropriate."

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Yafi, 69 Va. App. at 552 (quoting Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271 (2005)). "Considerably more 'retrospective in nature,' subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services." Toms, 46 Va. App. at 271 (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63 (2003)).

Here, the circuit court found that mother had "significant issues," and the Department had provided her "a lot of services." The circuit court found that the condition of the home when the

children were removed was "horrible." The circuit court noted that mother and Ryan had argued that their current home may be clean now, but no children were living there.

The circuit court had an opportunity to see and hear the witnesses. It found the Department's witnesses to be credible and was "persuaded by the multiple witnesses," who testified that mother had made "minimal progress." "It is well established that the trier of fact ascertains a witness' credibility, determines the weight to be given to their testimony, and has discretion to accept or reject any of the witness' testimony." Layman v. Layman, 62 Va. App. 134, 137 (2013) (quoting Street v. Street, 25 Va. App. 380, 387 (1997) (*en banc*)). "This Court is bound by the credibility findings of the circuit court." Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 339 (2013).

Mother had a long history of mental health and emotional issues. Although mother had participated in counseling for years, she had not improved her situation. Dr. Anderson opined that mother would need counseling for "an indeterminate amount of time . . . to keep things from deteriorating, getting out of hand." All of the children were in counseling. At the time of the circuit court hearing, the children had been in foster care for approximately eighteen months, and mother admitted that she was not in a position to have all five children come home. Although mother and Ryan advocated for T.L. to return to their care, they had never progressed to the point of having unsupervised or overnight visitations with him.

"It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Id. at 322 (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540 (1990)).

Based on the totality of the evidence, the circuit court did not err in terminating mother's parental rights under Code § 16.1-283(C)(2). "When a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to

- 10 -

sustain the judgment of the trial court, and if so, we need not address the other grounds." <u>Kilby v. Culpeper Cty. Dep't of Soc. Servs.</u>, 55 Va. App. 106, 108 n.1 (2009); <u>see also</u> <u>Fields v. Dinwiddie Cty. Dep't of Soc. Servs.</u>, 46 Va. App. 1, 8 (2005) (the Court affirmed termination of parental rights under one subsection of Code § 16.1-283 and did not need to address termination of parental rights pursuant to another subsection). Therefore, we will not consider whether the circuit court erred in terminating mother's parental rights pursuant to Code § 16.1-283(B).

CONCLUSION

For the foregoing reasons, the circuit court's ruling is summarily affirmed. Rule 5A:27.

<u>Affirmed.</u>